LAW OFFICES OF C. KENDALL HARRELL, P.C.; Martin & Smith; Seasons Cafe and Bakery; and Jerry and Andrea Usrey d/b/a Kwik–Kopy Kwik Kopy Printing # 99

v.

COMMERCE SAVINGS ASSOCIATION and PAC I Associates, Ltd.

No. SA–89–CA–1387.

United States District Court,
W.D. Texas,
San Antonio Division.

June 16, 1993.

1162

Elizabeth Joan Lindell, Davidson, Troilo & Booth, San Antonio, TX, for cross-plaintiff, counter-defendant, and third-party plaintiff Resolution Trust Corp. as Conservator for Commerce Sav. Ass'n.

Emerson Banack, Jr. and Thomas M. Pickford, Foster, Lewis, Langley, Gardner & Banack, Inc., San Antonio, TX, for counter-plaintiff and cross-defendant PAC I Associates, Ltd. and third-party defendants Transland Management Corp., Donald F. Goldman and Robert Neely.

Nicasio Dimas, Jr., Law Offices of Nicasio Dimas, Jr., San Antonio, TX, for intervenor City Public Service Bd.

## DECISION and ORDER

MYRON L. GORDON, Senior District Judge.

The above-captioned action came to trial before the court. At the close of evidence, posttrial briefs were filed, and the court took the case under advisement.

## I. INTRODUCTION

This action primarily involves a dispute between co-defendants Resolution Trust Corporation [RTC], the conservator, and later receiver, for both Commerce Savings Association [CSA] and Commerce Federal Savings Association [CFSA] (the successor to CSA), and PAC I Associates, Ltd. [PAC].

In late December 1985, CSA totally financed PAC's $24,000,000 purchase of the Commerce Plaza Building [Commerce Building], located in San Antonio, from Commerce Service Corporation [CSC], a wholly owned subsidiary of CSA. The real estate transaction was complex; numerous documents were executed by CSA, CSC and PAC to record the details of the sale.

The documents also memorialized the assignment and conveyance of "a leasehold interest in The Randstone Venture Parking Agreement" [the Randstone leasehold interest] from CSA to CSC and from CSC to PAC. Commerce Plaza Associates originally owned the Randstone leasehold interest which was created in The Randstone Venture Parking Agreement executed on February 15, 1982, between The Randstone Venture and Commerce Plaza Associates. The owner of the Randstone leasehold interest is entitled to lease 260 parking spaces in the Randstone Parking Garage from The Randstone Venture and re-lease those parking spaces to individual parking tenants.

PAC defaulted on its financial obligations to CSA in the spring of 1989. A dispute arose between CSA and PAC over what items of collateral constituted the security for CSA's loan to PAC and over the nature of the various security devices included in the documents executed by CSA, CSC and PAC at the time of the December 1985 sale of the Commerce Building. CSA and PAC contested primarily, but not exclusively, the rights to Commerce Building tenant rentals generated from office space leased by PAC to tenants in the Commerce Building between the date of PAC's default and August 1, 1989,—the date CSA foreclosed its deed of trust lien held on the Commerce Building; the ownership of the Randstone leasehold interest; and the ownership, from the date of PAC's default, to parking rentals generated from ownership of the Randstone leasehold interest.

In May 1989, CSA and PAC each sent conflicting letters to Commerce Building tenants, many of whom also rented parking space in the Randstone Parking Garage. Both CSA and PAC asserted in their respective letters that it was the proper party to whom tenants should remit their monthly rental payments for both office and parking space. Faced with the prospect of conflicting claims over their monthly rental payments and the possibility of dual liability, some of the tenants in the Commerce Building, the original plaintiffs in this action, commenced an interpleader action against co-defendants CSA and PAC in Texas state court on June 5, 1989.

In August 1989, the RTC became the conservator for CSA. The RTC removed this entire action to federal district court on October 6, 1989. Federal court jurisdiction is pursuant to 12 U.S.C. §§ 1441a($l$)(1) and (3), 28 U.S.C. § 1331 and 28 U.S.C. § 1441. On December 13, 1990, the RTC was appointed as the receiver for CSA, which was reorganized at that time as CFSA [hereinafter CFSA, CSA and the RTC will be referred to simply as CSA/RTC except where it is necessary or helpful to refer to these entities individually (i.e. as CFSA, CSA, or RTC)].

Co-defendants CSA/RTC and PAC filed cross-claims against each other. CSA/RTC also filed third-party claims against Transland Management Corporation [Transland], PAC's property manager of the Commerce Building, Donald G. Goldman, Transland's president, and Robert B. Neely, Transland's vice president.

In April 1990, the City of San Antonio, by and through the City Public Service Board of San Antonio [CPSB], filed a motion to intervene in this action. That motion was granted, and CPSB filed its complaint alleging entitlement to $38,558.33 in unpaid utility service provided by CPSB to the Commerce Building during June and July of 1989.

## II. THE CLAIMS AND RELIEF REQUESTED BY THE PARTIES

### A. The Plaintiffs

In their interpleader complaint, the plaintiffs [Law Offices of C. Kendall Harrell, P.C.; Martin & Smith; Seasons Cafe and Bakery; and Jerry and Andrea Usrey, d/b/a Kwik–Kopy Kwik Kopy Printing # 99] request the court to determine whether CSA/RTC or PAC is entitled to their rent payments for office space in the Commerce Building and parking space in the Randstone Parking Garage for those months that CSA and PAC assert conflicting claims over those monies. The plaintiffs also ask the court to award them their reasonable attorneys fees and costs of bringing their interpleader action.

## B. CSA/RTC—Cross-plaintiff, Counter-defendant, and Third-party Plaintiff

CSA/RTC brings cross-claims against PAC and third-party claims against Transland, Mr. Goldman, and Mr. Neely. CSA/RTC alleges a smorgasbord of cross-claims against PAC that include, among others, breach of contract, misappropriation, tortious interference with contractual relations, conversion and unjust enrichment.

In a highly repetitious complaint, CSA/RTC requests the following relief against PAC based on some or all of the above-listed theories of recovery:

(1) Compensatory damages for "the net cash flow" generated by the Commerce Building property. This presumably means all rental income from Commerce Building tenants from the date of PAC's default through August 1, 1989 [CSA/RTC's Request for Relief (C/R–RFR) # 1].

(2) Compensatory damages in an amount equal to the Rutherford and Laye judgment obtained by PAC in Texas state court against the former Commerce Building tenants Rutherford and Laye who defaulted on their Commerce Building lease [C/R–RFR # 2].

(3) Consequential damages for the "loss of tenant rentals, parking revenues, and time and expense in contacting tenants in an attempt to correct" misrepresentations made by PAC to Commerce Building tenants [C/R–RFR # 3].

(4) Exemplary damages for PAC's alleged tortious interference with contractual relations [C/R–RFR # 4].

(5) Exemplary damages for PAC's alleged conversion of money belonging to CSA/RTC [C/R–RFR # 5].

(6) Exemplary damages for PAC's alleged misappropriation of money belonging to CSA/RTC [C/R–RFR # 6].

(7) A declaratory judgment that CSA/RTC "had a valid lien against the parking rights and that the August 1, 1989 foreclosure was effective to foreclose its lien on the parking rights and revenues, which were intended to be retained to secure [PAC's] indebtedness," or, alternatively, "judicial foreclosure of its liens on the parking rights and revenues" [C/R–RFR # 7].

(8) A declaratory judgment that "any and all monies received by [CSA/RTC] from tenants for parking at the Rand[stone] [Parking] Garage or any monies it is ordered to pay [PAC] are properly held by [CSA/RTC] pursuant to its right of offset set forth in Section 7.6 of the Loan Agreement" [C/R–RFR # 8].

(9) "Reasonable attorneys' fees incurred by [CSA/RTC] in the collection of the indebtedness reflected in the Notes" [C/R–RFR # 9].

(10) A declaratory judgment that CSA/RTC "is the legal owner of all net cash flow accruing at the Commerce Plaza Building *since [PAC] acquired the property* " (emphasis added) [C/R–RFR # 10].

(11) A declaratory judgment that CSA/RTC is "entitled to all proceeds received by [PAC] pursuant to the judgment rendered by the 285th Judicial District Court of Bexar County, Texas, in Cause No. 87–CI–10115 on August 3, 1989." [C/R–RFR # 11]

(12) An injunction "preventing [PAC] from dissipating, secreting, or otherwise disposing" of the "Rutherford and Laye" judgment [C/R–RFR # 12].

(13) An injunction "enjoining [PAC], its agents, attorneys, servants, and employees from directly or indirectly contacting Commerce [Building] tenants concerning the status of their lease, alleged liability for rentals, and/or parking payments, or from collecting or accepting any rentals or parking payments from such tenants, or from making any representations concerning the legal status of the property or the legal relationship of the parties in this cause . . . ." [C/R–RFR # 13].

CSA/RTC also filed third-party claims against Transland, Mr. Goldman and Mr. Neely. CSA/RTC's complaint appears to allege three claims against each of these parties: (1) tortious interference with contract; (2) conversion; and (3) misappropriation. CSA/RTC seeks the following relief from each of the three third-party defendants:

(14–16) Consequential damages for the "loss of tenant rentals, parking revenues, and time and expense in contacting tenants in an attempt to correct" misrepresentations made by Transland, Mr. Goldman and Mr. Neely to Commerce Building tenants [C/R–RFR # 14 (Transland), # 15 (Goldman), # 16 (Neely)].

(17–19) Compensatory damages for Transland's, Mr. Goldman's and Mr. Neely's alleged misappropriation of money belonging to CSA/RTC [C/R–RFR # 17 (Transland), # 18 (Goldman), # 19 (Neely)].

(20–22) Exemplary damages for Transland's, Mr. Goldman's and Mr. Neely's alleged misappropriation of money belonging to CSA/RTC [C/R–RFR # 20 (Transland), # 21 (Goldman), # 22 (Neely)].

(23–25) Exemplary damages for Transland's, Mr. Goldman's and Mr. Neely's alleged tortious interference with contractual relations [C/R–RFR # 23 (Transland), # 24 (Goldman), # 25 (Neely)].

(26–28) Exemplary damages for Transland's, Mr. Goldman's and Mr. Neely's alleged conversion of money belonging to CSA/RTC [C/R–RFR # 26 (Transland), # 27 (Goldman), # 28 (Neely)].

## C. PAC—Counter-plaintiff and Cross-defendant

PAC alleges numerous cross-claims against CSA/RTC. These include, among others, "money had and received and/or conversion and/or unjust enrichment," intentional interference with contractual relations, reimbursement and/or unjust enrichment, and breach of contract. Like CSA/RTC's complaint, PAC's complaint is also repetitive.

The court has gleaned from PAC's complaint that it seeks the following relief against CSA/RTC based on some or all of the above-listed theories of recovery:

(1) A declaratory judgment that the "vendor's lien retained by [CSC] at the sale closing on the Building was extinguished when [CSA/RTC] properly funded its loans to PAC" [PAC's Request for Relief (P–RFR) # 1].

(2) A declaratory judgment that "PAC, and not [CSA/RTC], possesses full right, title, and interest to the Parking rights in the [Randstone Parking] Garage" [P–RFR # 2].

(3) A declaratory judgment that "[s]ince the date of the conveyance of the [Commerce] Building, PAC has and continues to possess all right, title, and interest to all rent payments (including parking payments) received by PAC from Tenants at the Building, or held by Tenants, or placed into escrow by Tenants or deposited into the Registry of the Court which were due and owing prior to the Foreclosure by Commerce" [P–RFR # 3].

(4) A declaratory judgment that CSA/RTC "possesses no right, title or interest to any rent payments (including parking payments) received from Tenants at the Building, which payments were due and owing by Tenants prior to the Foreclosure, and further [CSA/RTC] should be required to deliver to PAC immediately any such rent payments received by Commerce from Tenants prior to the Foreclosure, together with prejudgment interest at the highest legal rate on such sums" [P–RFR # 4].

(5) A declaratory judgment that CSA/RTC "possesses no right, title or interest to any rent payments (including parking payments) held by Tenants, or placed into escrow by Tenants or deposited into the registry of the court by Tenants which were due and owing prior to the foreclosure by [CSA/RTC]" [P–RFR # 5].

(6) A declaratory judgment that "PAC possesses all right, title, and interest to all Parking Payments received by [CSA/RTC] from Tenants at the Building prior to August 1, 1989, and further [CSA/RTC] should be required to deliver immediately to PAC any such Parking Payments received by [CSA/RTC], together with prejudgment interest at the highest legal rate on such sums" [P–RFR # 6].

(7) A declaratory judgment that "PAC, and not [CSA/RTC], possesses full right, title and interest to the Judgment dated April 18, 1989 and executed on August 3, 1989, granting damages to PAC against the law firm of Rutherford and Laye" [P–RFR # 7].

(8) A declaratory judgment that CSA/RTC "possesses no right, title or interest to the Judgment dated April 18, 1989 and executed on August 3, 1989, [granting damages] to PAC against the law firm of Rutherford and Laye" [P–RFR # 8].

(9) An order directing CSA/RTC to "render an accounting to PAC, such accounting being necessary for PAC to determine the unknown amount of monies owed to it by [CSA/RTC]" [P–RFR # 9].

(10) Compensatory damages equal to "the fair market value of the [Randstone] Parking [Garage] [s]paces … for the period from August 1, 1989, to the present day" [P–RFR # 10].

(11) Compensatory damages for parking rentals "improperly held by [CSA/RTC], together with interest at the highest legal rate on such sums" [P–RFR # 11].

(12) Compensatory damages for "all sums of money on deposit with the Registry of the Court" [P–RFR # 12].

(13) Consequential damages to PAC for damages arising from CSA/RTC "willfully and intentionally induc[ing] some of the [Commerce Building] Tenants to breach and violate the provisions of their [Commerce Building] leases with PAC" [P–RFR # 13].

(14) Compensatory damages to PAC "for expenses incurred in the operation of the [Commerce] [B]uilding and rental payments made to Randstone Venture as may be allowed by equity or law" [P–RFR # 14].

(15) Consequential damages to PAC for "the loss of prospective rentals" arising because of CSA/RTC's alleged withholding of approval of Commerce Building tenant leases [P–RFR # 15].

(16) Compensatory damages to PAC for CSA/RTC's violation of its lease with PAC by "failing to pay to PAC rent and other charges when it became due and owing" [P–RFR # 16].

(17) "Reasonable attorneys' fees, pursuant to applicable sections of the Texas Civil Practice and Remedies Code, including but not limited to Section 37.009" [P–RFR # 17].

(18) "[L]egal and/or equitable recision of the entire purchase and loan transaction between PAC and [CSA/RTC]" [P–RFR # 18].

(19) "[A]ll sums of money tendered by PAC to [CSA/RTC] pursuant to the purchase and loan transaction" [P–RFR # 19].

### D. CPSB—The Intervenor

CPSB seeks $38,558.33 in damages for utility services provided to the Commerce Building during June and July 1989. CPSB asks that the court order these funds to be paid to it out of tenant and parking rentals interpleaded into the court's registry before determining how that money should be allocated between CSA/RTC and PAC, the principal parties disputing ownership to those funds. CPSB also seeks any applicable pre- and post-judgment interest, court costs and attorneys fees for bringing its intervenor action.

### III. PRELIMINARY MATTERS

At trial, the remaining parties to this action were CSA/RTC, PAC, Transland, Mr. Goldman and CPSB. The original plaintiffs were dismissed from this action in June 1990. On January 15, 1991, CSA/RTC filed a "Stipulation of Dismissal" dismissing Mr. Neely from this action. Additionally, some of CSA/RTC's and PAC's claims and requests for relief were resolved by summary judgment. These matters will be discussed briefly in this section III.

### A. The Dismissal of the Original Plaintiffs

With the court's approval, on June 4, 1990, CSA/RTC, PAC, and the plaintiffs signed an "Agreed Order of Dismissal and Deposit of Funds into the Court Registry" [Agreed Order]. CSA/RTC, PAC and the plaintiffs, except for Martin & Smith, each deposited funds into the court's registry for ultimate deposit at the Frost National Bank located in San Antonio pending final disposition of this action.

CSA/RTC deposited a $11,271.82 check from Green & McReynolds for the rental of Commerce Building office space and Randstone Parking Garage space for July 1989.

PAC deposited $24,781.12 in Commerce Building tenant rentals and Randstone Parking Garage rentals received for June 1989. PAC's deposit consisted of a $15,750.83 check from Compass Property Management, Inc., a $7,184.50 check from Kugle & Frederick, and a $1,845.79 check from the Law Offices of Gregory W. Canfield. Finally, $20,794.26 retained and/or escrowed by individual Commerce Building tenants was deposited. This money was rent for both Commerce Building office space and Randstone Parking Garage space for June and July 1989. These funds consisted of a $10,052.54 check from the Law Offices of Harberger and Rodriguez, a $4,830.32 check from plaintiff, Law Offices of C. Kendall Harrell, P.C., a $3,861.90 check from plaintiff Seasons Cafe & Bakery, and a $2,049.50 check from plaintiff Jerry and Andrea Usrey, d/b/a Kwik–Kopy Kwik Kopy Printing # 99. Therefore, a total of $56,847.20 was deposited into the court's registry. *See* Agreed Order dated June 4, 1990.

In the Agreed Order, the court also ordered the deduction of a registry fee by the clerk of court pursuant to 28 U.S.C. § 2041 and Rule 67, Federal Rules of Civil Procedure. Consequently, on August 9, 1990, the court ordered the clerk of court to deduct a registry fee of $459.83 from the interpleaded funds. Finally, in the Agreed Order, the court dismissed the plaintiffs from this action, with prejudice, and awarded the plaintiffs the sum of $2,500 in attorneys fees, to be deducted from the interpleaded funds. Thus, after deducting the registry fee and attorneys fees, $53,887.37 [$56,847.20 − $459.83 − $2,500] of the original interpleaded funds, plus accrued interest, remains to be allocated by the court to CSA/RTC, PAC, CPSB, or any combination of these parties, all of whom assert an ownership interest in these funds.

### B. The Dismissal of Mr. Neely

CSA/RTC brought third-party claims against Robert B. Neely. However, on January 15, 1991, CSA/RTC filed a "Stipulation of Dismissal," dismissing him from this action.

### C. Matters Resolved by Summary Judgment

CSA/RTC, PAC, Transland and Mr. Goldman all filed summary judgment motions pri-

or to trial. In an order dated October 8, 1992, the Honorable Edward C. Prado issued a decision disposing of these cross motions for summary judgment. His decision largely followed the memorandum and recommendation of United States Magistrate Judge John W. Primomo.

Judge Prado's October 8, 1992, order concluded with the following mandate:

Accordingly, it is hereby ORDERED that the United States Magistrate's Memorandum and Recommendation filed in this cause on February 28, 1991, be and is ACCEPTED IN PART AND MODIFIED IN PART pursuant to 28 U.S.C. § 636(b)(1) such that summary judgment is GRANTED:

(1) for the RTC on its claim of entitlement to the tenant rentals between the date of PAC's default and the date of foreclosure on August 1, 1989;

(2) for the RTC for recovery of the Rutherford and Laye judgment;

(3) for Transland and Donald F. Goldman on the misappropriation claims only;

(4) for the RTC on its right to recover attorney's fees in collecting on the note; and

(5) for the RTC on PAC's claim for punitive damages.

***In all other respects, the motions for summary judgment are DENIED.***

Order dated October 8, 1992, at 7–8 (emphasis added).

The Rutherford and Laye judgment was entered in Texas state court on August 3, 1989, against the former Commerce Building tenants, Rutherford and Laye, who defaulted on their Commerce Building lease. In accordance with Judge Prado's mandate, the court will direct the clerk of court to enter a declaratory judgment that CSA/RTC is entitled either to collect the proceeds of the Rutherford and Laye judgment or, in the alternative, to collect damages from PAC in an amount equivalent to that which PAC received from Rutherford and Laye in the event the judgment has been satisfied by Rutherford and Laye. *See* Exhibit H, CSA/RTC's Second Amended Cross–Action for

specifics of the judgment. Furthermore, the court will direct the clerk of court to enter *judgment dismissing, with prejudice, and with costs, CSA/RTC's misappropriation claims against Transland and Mr. Goldman.* The court will direct the clerk of court to enter judgment with respect to the balance of Judge Prado's summary judgment order after additional issues relating to rulings in his order, including factual issues raised at trial, are hereinafter resolved in this decision and order.

## IV. THE CLAIMS AND RELIEF REQUESTED BY CSA/RTC AND PAC TO BE CONSIDERED IN THIS DECISION AND ORDER

Both CSA/RTC and PAC have made voluminous and varied requests for specific relief from this court. These requests for relief are laid out above, in considerable detail, in Part II of this decision and order. By my tally, taking into account repetition in the complaints, CSA/RTC has made twenty-eight specific requests for relief against PAC and third-party defendants Transland, Mr. Goldman and Mr. Neely. PAC has checked in with, an almost as whopping, nineteen different requests for relief against CSA/RTC.

To date, according to my scorecard, the following requests for relief [RFR] made by CSA/RTC [C/R] and PAC [P] have already been disposed of by this court and therefore merit no further attention:

(1) C/R–RFR # 2, # 11, # 12 and P–RFR # 7 and # 8—all of these requests for relief relate to the Rutherford and Laye judgment issue decided in favor of CSA/RTC in Judge Prado's October 8, 1992, summary judgment order.

(12) C/R–RFR # 17, # 18, # 20, and # 21—all of these requests for relief relate to CSA/RTC's misappropriation claims for compensatory and exemplary damages against Transland and Mr. Goldman that Judge Prado ordered dismissed in his October 8, 1992, summary judgment order.

(3) C/R–RFR # 16, # 19, # 22, # 25, # 28—all of these requests for relief relate to claims against Mr. Neely who was dismissed from this case via CSA/RTC's "Stipulation of Dismissal" dated January 15, 1991.

(4) P–RFR # 3, # 4, # 5, and # 12—all of these requests for relief, to the extent that they relate to PAC's claims for Commerce Building tenant rentals, after PAC's default, are now moot in light of Judge Prado's summary judgment order.

In addition to the above requests for relief already disposed of, the court finds, after consideration of the evidence presented at trial, along with the pretrial order, the pretrial briefs and the posttrial briefs, that both CSA/RTC and PAC have each abandoned several of their requests for relief.

The court finds that CSA/RTC has abandoned C/R–RFR # 's 3, 4, 6, 10, 13–15 and 23–24 and that PAC has abandoned P–RFR #'s 9, 10, 15, 16, 18 and 19. CSA/RTC and PAC introduced no evidence, or very little evidence, to support the above-listed requests for relief and also have failed to address these requests for relief adequately in their pre- and posttrial submissions to establish entitlement to any recovery.

Therefore, CSA/RTC's only requests for relief that require further consideration and resolution by the court at this juncture are C/R–RFR # 1 (concerning CSA/RTC's request for compensatory damages for tenant rentals), C/R–RFR # 5 (concerning CSA/RTC's request for exemplary damages against PAC for conversion), C/R–RFR # 7 (concerning CSA/RTC's request that it be declared the owner of the Randstone leasehold interest), C/R–RFR # 8 (concerning CSA/RTC's request that the court declare that it has a right of offset), C/R–RFR # 9 (concerning CSA/RTC's request for attorneys fees) and C/R–RFR Nos. 26 and 27 (concerning CSA/RTC's request for exemplary damages against Transland and Mr. Goldman for conversion).

Judge Prado's October 8, 1992, summary judgment order did largely resolve CSA/RTC's request for disputed Commerce Building tenant rentals [C/R–RFR # 1] and its request for "attorneys' fees in collecting on the note" [C/R–RFR # 9]. However, a few important issues to be resolved in this deci-

sion and order remain with respect to these two requests for relief.

PAC's remaining requests for relief that require consideration and resolution by the court are P–RFR #'s 1 and 2 (concerning PAC's request that it be declared the owner of the Randstone leasehold interest), P–RFR #'s 3, 4, 5 and 12 (only to the extent that these requests for relief concern PAC's claim for tenant rentals prior to its default and only to the extent that it be declared the owner of parking rentals generated through ownership of the Randstone leasehold interest), P–RFR #'s 6 and 11 (concerning PAC's request that it be declared the owner of parking rentals generated through ownership of the Randstone leasehold interest), P–RFR # 13 (concerning PAC's request for consequential damages against CSA/RTC for intentional interference with contract), P–RFR # 14 (concerning PAC's request for compensatory damages against CSA/RTC for PAC's expenses in operating the Commerce Building prior to August 1, 1989), and P–RFR # 17 (concerning PAC's request for attorneys fees). Judge Prado did conclude in his October 8, 1992, summary judgment order, with respect to PAC's request for damages arising from intentional interference with contractual relations by CSA/RTC [P–RFR # 13], that PAC is not entitled to any punitive damages from CSA/RTC for that alleged tort.

## V. BACKGROUND FINDINGS OF FACT

Having considered all of the evidence, the pretrial briefs and the posttrial briefs, the court now states background findings of fact relevant to all issues presented at trial. These findings are made in accordance with Rule 52(a), Federal Rules of Civil Procedure.

1. The Commerce Building is located in San Antonio, Bexar County, Texas [Pretrial Order Stipulation (POS) 5.2].

2. In December 1985, the Commerce Building was owned by CSA [plaintiff's exhibits # 16, # 17, and # 37].

3. In December 1985, CSA was a state of Texas chartered savings and loan association [POS 5.10].

4. CSC was a wholly owned subsidiary of CSA in December 1985 [testimony of Glenn D. West].

5. PAC is a Texas limited partnership organized under the laws of Texas with its principal place of business in Dallas County [POS 5.3].

6. Transland was a general partner of PAC in December 1985. Transland is a corporation organized under the laws of Texas with its principal place of business in Dallas County. Transland is an existing corporation [POS 5.4 and POS 5.9].

7. San Antonio Office Corporation is a general partner of PAC [testimony of Donald F. Goldman].

8. Mr. Goldman is a limited partner of PAC. He is president of Transland and San Antonio Office Corporation [POS 5.5 and POS 5.6].

9. Intervenor CPSB is a municipal board of the city of San Antonio [POS 5.26].

10. Towards the close of 1985, representatives of CSA and CSC began negotiating with representatives of PAC, concerning the sale of the Commerce Building from CSA to CSC and then immediately from CSC to PAC. The negotiations occurred primarily during December 1985 [testimony of Mr. West and Mr. Goldman].

11. The principal negotiators for CSA and CSC were Mr. West, an attorney who was a partner at the time of the negotiations in the law firm of Jackson, Walker, Winstead, Cantwell & Miller of Dallas; Roger D. Harrison, a director of CSA in December 1985 and president of CSA in October 1989; and Gerald H. Stool, owner of American Century Corporation that owned CSA [testimony of Mr. West; deposition testimony of Mr. Harrison at p. 10, lines 6–11; plaintiff's exhibit # 37; and deposition testimony of Mr. Stool, p. 9, lines 6–16].

12. The principal negotiators for PAC were John J. Reoch, PAC's attorney who was a partner in the law firm of Stutzman & Bromberg of Dallas at the time of the negotiations and Mr. Goldman, the president of Transland [testimony of Mr. Goldman and

deposition testimony of Mr. Reoch, p. 11, lines 22–25, p. 12, line 1, p. 19, lines 11–19].

13. Transland was the general partner acting on behalf of PAC in the negotiations [testimony of Mr. Goldman].

14. On or about December 28–30, 1985, a deal was reached between CSA, CSC and PAC in which PAC agreed to purchase the Commerce Building from CSC after CSC purchased the building from CSA. To facilitate the transaction, CSA agreed to finance PAC's purchase of the Commerce Building from CSC [testimony of Mr. West and Mr. Goldman].

15. On December 26, 1985, the respective boards of directors of CSA and CSC each adopted unanimous consent resolutions approving the ultimate sale of the Commerce Building to PAC and authorizing Mr. Harrison, as a director of both CSA and CSC, "to execute any and all documents necessary or desirable to effectuate" the sale of the Commerce Building to PAC [plaintiff's exhibits # 37 and # 38].

16. On December 28, 1985, Mr. Harrison executed and signed a special warranty deed on behalf of CSA conveying the Commerce Building from CSA to CSC [plaintiff's exhibit # 16].

17. On December 28, 1985, Mr. Harrison signed on behalf of both CSA and CSC a blanket conveyance, bill of sale, assignment, and assumption agreement effective as of December 30, 1985, conveying and assigning from CSA to CSC numerous described properties, rights and interests associated with the Commerce Building including, but not limited to, CSA's "interest in that certain Parking Agreement ... dated February 15, 1985 [sic], between The Randstone Venture and Commerce Plaza Associates, which, among other things, grants the right to utilize parking spaces" in the Randstone Parking Garage [plaintiff's exhibit # 17].

18. The Randstone Venture is the owner of the Randstone Parking Garage and the lessor of the Randstone leasehold interest created in the Randstone Venture Parking Agreement [POS 5.24].

19. The "interest in that certain Parking Agreement" conveyed and assigned from CSA to CSC in the blanket conveyance, bill of sale, assignment and assumption agreement is a leasehold interest originally obtained by Commerce Plaza Associates in a parking agreement, dated February 15, 1982, between it and The Randstone Venture [plaintiff's exhibit # 1].

20. On December 28, 1985, Mr. Harrison executed and signed a special warranty deed on behalf of CSC conveying the Commerce Building from CSC to PAC [plaintiff's exhibit # 18].

21. The total price paid by PAC to CSC for the purchase of the Commerce Building was $24,000,000 [plaintiff's exhibit # 4].

22. On December 30, 1985, PAC received a loan from CSA to purchase the Commerce Building from CSC. To evidence the loan, PAC executed and delivered to CSA two promissory notes payable to CSA totalling $27,000,000 signed by Mr. Goldman as president of Transland, a general partner of PAC, in the amounts of $2,700,000 and $24,300,000 [POS 5.16, plaintiff's exhibits # 5, # 6, # 7 and # 8].

23. The proceeds of CSA's loan to PAC, evidenced by the $2,700,000 down payment promissory note executed by PAC and payable to CSA, were to "be used solely to fund Borrower's [PAC's] acquisition of the Property [the Commerce Building 'with all improvements thereon'] ..." from CSC [plaintiff's exhibit # 5 at 1–2].

24. The proceeds of CSA's loan to PAC, evidenced by the $24,300,000 primary promissory note executed by PAC and payable to CSA, were to "be used solely ... to fund Borrower's [PAC's] acquisition of the Property [the Commerce Building 'with all improvements thereon'] to the extent of $21,300,000.00" ... [and] "to fund tenant finish improvements to the Property, to the extent of $3,000,000.00, as such proceeds may be funded to Borrower at Lender's reasonable discretion" [plaintiff's exhibit # 5 at 1–2].

25. The $2,700,000 down payment note was a recourse note and the $24,300,000 primary note was a nonrecourse note although the loan agreement contained exceptions to the nonrecourse nature of the primary note

[POS 5.22; plaintiff's exhibit # 5 at 16; testimony of Mr. Goldman; deposition testimony of Mr. Reoch, p. 26, lines 3–16; April 19, 1991, deposition testimony of Ray C. Wilson, p. 20, lines 15–18].

26. On December 28, 1985, Mr. Harrison signed on behalf of CSC, and Mr. Goldman signed on behalf of PAC, a blanket conveyance, bill of sale, assignment, and assumption agreement effective as of December 30, 1985, conveying and assigning from CSC to PAC, for consideration of $10, numerous described properties, rights and interests associated with the Commerce Building including, but not limited to, CSC's "interest in that certain Parking Agreement ... dated February 15, 1985 [sic], between The Randstone Venture and Commerce Plaza Associates, which, among other things, grants the right to utilize parking spaces" in the Randstone Parking Garage [plaintiff's exhibit # 2].

27. On December 30, 1985, Mr. Harrison, on behalf of CSA as the lender, and Mr. Goldman on behalf of PAC as the borrower, signed a loan agreement documenting the terms of the loan made by CSA to PAC to finance PAC's purchase of the Commerce Building from CSC [plaintiff's exhibit # 5].

28. On December 28, 1985, Mr. Goldman, on behalf of PAC, signed a deed of trust (with security agreement, assignment of rents and financing statement) dated December 30, 1985, in which PAC conveyed the Commerce Building to John T. Steen, trustee for CSA, as security for CSA's $2,700,000 and $24,300,000 loans to PAC as evidenced by the down payment and primary promissory notes that were executed and delivered to CSA [plaintiff's exhibit # 8].

29. Numerous other closing documents (e.g. seller's closing certificate, purchaser's closing certificate, assignment of net profits interest, net profits deed of trust, financing statement, etc.) were also signed and executed by the various parties involved in the December 28–30, 1985, sale of the Commerce Building from CSA to CSC and from CSC to PAC [defendants' exhibit # 71].

30. CSA's and CSC's attorneys, Mr. West and others at Jackson, Walker, Winstead, Cantwell & Miller, and not PAC's attorneys, drafted the sale and loan documents memorializing the sale of the Commerce Building from CSA to CSC and from CSC to PAC. PAC's lawyers did review the documents and suggest modifications to them [deposition testimony of Mr. Harrison, p. 362, lines 2–25; deposition testimony of Mr. Stool, p. 40, lines 5–23; deposition testimony of Mr. Reoch, p. 19, lines 11–19].

31. There were no oral agreements or side agreements in addition to the written sale and loan documents memorializing the sale of the Commerce Building from CSA to CSC and from CSC to PAC [testimony of Mr. West; deposition testimony of Mr. Harrison, p. 258, lines 6–24; deposition testimony of Mr. Stool, p. 24, lines 9–12].

32. Subsequent to PAC's purchase of the Commerce Building, PAC entered into an agreement with CPSB in which CPSB agreed to provide utility service to the Commerce Building [POS 5.27].

33. By resolution dated February 28, 1989, the Federal Home Loan Bank Board [FHLBB] declared CSA insolvent and appointed the Federal Savings and Loan Insurance Corporation [FSLIC] as sole conservator for CSA [POS 5.10].

34. By April 1989, PAC had fully paid off the $2,700,000 down payment note to CSA. This was earlier than it was obligated to do so under the loan documentation [POS 5.43; testimony of Mr. Goldman; deposition testimony of Mr. Harrison, p. 241, lines 12–24].

35. PAC failed to pay to the FSLIC, as conservator for CSA, the interest payment due on April 1, 1989, as set forth in the $24,300,000 primary note [POS 5.17].

36. CPSB provided electrical service to the Commerce Building in June and July 1989 [POS 5.28].

37. CPSB was not paid for the utility service it provided to the Commerce Building in June and July 1989. The unpaid amount totals $38,558.33 [POS 5.29].

38. On August 1, 1989, the Commerce Building was sold at public sale pursuant to the terms of the deed of trust. The FSLIC, as Conservator for CSA, purchased the building for $8,776,250. The balance remain-

ing on the promissory notes signed by PAC after applying the proceeds of that sale to the indebtedness totals $21,648,238 [POS 5.21].

39. On August 9, 1989, the RTC succeeded the FSLIC as the conservator of CSA [POS 5.11 and 5.68].

40. Both CSA/RTC and PAC claim entitlement to monthly rental payments from the tenants leasing space in the Commerce Building for the period from April 1, 1989, through August 1, 1989. Additionally, both CSA/RTC and PAC claim entitlement to the rentals generated from the leasing of parking space in the Randstone Parking Garage to Commerce Building tenants. Finally, both CSA/RTC claim they own the Randstone leasehold interest [testimony of Mr. West and Mr. Goldman].

41. On December 13, 1990, the Office of Thrift Supervision [OTS] appointed the RTC as receiver for CSA, replacing the conservator, by Order No. 90–3048, for the purpose of liquidating CSA [POS 5.12].

42. On December 13, 1990, the OTS, by Order No. 90–3049, organized CFSA to take over such assets of CSA as the RTC deemed to be appropriate, including all claims relating to the loan documents and transaction which forms the basis of this lawsuit [POS 5.13].

43. On December 13, 1990, by Order No. 90–3050, the OTS appointed the RTC as conservator for CFSA [POS 5.14].

44. On July 11, 1991, by Order No. DAL–91–86, the OTS replaced the RTC as conservator of CFSA with the RTC as receiver of CFSA [POS 5.15].

## VI. ADDITIONAL FINDINGS OF FACT; CONCLUSIONS OF LAW; AND ANALYSIS

### A. *Commerce Building Tenant Rentals [C/R–RFR # 1; P–RFR #'s 3, 4, 5 and 12]*

■ In his summary judgment order, Judge Prado partially decided the question of CSA/RTC's and PAC's competing claims for Commerce Building tenant rentals. He concluded that CSA/RTC was entitled to *"ten-*

*ant* rentals [from Commerce Building tenants] between **the date of PAC's default** and the date of foreclosure on August 1, 1989" based on an absolute assignment of rents theory of recovery. *See* Summary Judgment Order dated October 8, 1992, at 2–3, 7 (emphasis added). I deem this ruling to be the law of the case, and therefore the court is required to enter judgment in accordance with Judge Prado's summary judgment order. *See United States v. Horton,* 622 F.2d 144, 148 (5th Cir.1980) (holding that a ruling on a "motion for partial summary judgment is the law of the case on the issues decided").

Two important trial issues must be resolved, however, before judgment can be entered in favor of CSA/RTC with respect to its claim for Commerce Building tenant rentals. First, in accordance with Judge Prado's summary judgment order, the court must decide the date of PAC's default on the $24,-300,000 primary note so as to determine the date at which CSA/RTC became entitled to Commerce Building tenant rentals. Second, from the date of PAC's default, the court must determine the dollar amount of Commerce Building tenant rentals to which CSA/RTC is entitled but has not yet received. These tenant rentals consist of those funds collected by PAC after the date of its default and those tenant rentals interpleaded into the court's registry.

### A–1. *Additional Findings of Fact*

45. Article 6.1(a) of the loan agreement executed by PAC and CSA defines default, in part, as "The failure of Borrower [PAC] to pay any installment of principal or interest of the Notes in accordance with their terms, through acceleration, or otherwise and the continuance thereof for ten (10) days after notice thereof is given by Lender [CSA/RTC] to Borrower [PAC] ..." [plaintiff's exhibit # 5 at 9].

46. Article 10.2 of the loan agreement executed by PAC and CSA states that "Notice shall be deemed to have been given or the demand or request made on the earlier of (i) the day it is actually received by Borrower [PAC], or (ii) three calendar days, or two (2) business days, whichever is lesser, after such notice, demand or request shall have been

deposited in the United States mails ..." [plaintiff's exhibit # 5 at 19].

47. On April 27, 1989, CSA mailed a demand letter to PAC requesting payment, on or before 2:00 o'clock p.m. on May 10, 1989, of the quarterly interest due on April 1, 1989, to keep the $24,300,000 primary promissory note current. That letter also advised PAC that failure to comply with the demand would result in acceleration of the entire note [POS 5.18, plaintiff's exhibit # 27].

48. April 27, 1989, was a Thursday. Therefore, in accordance with Article 10.2 of the loan agreement, PAC received notice of its default on Sunday, April 30, 1989, and, pursuant to Article 6.1(a) of the loan agreement, had ten days *after* notice was given, or until Wednesday, May 10, 1989, (i.e. May 1–10) to cure its default.

49. PAC failed to make its quarterly interest payment on the $24,300,000 primary note by May 10, 1989, at 2:00 p.m. as demanded by CSA [POS 5.19, plaintiff's exhibit # 24].

50. PAC collected approximately $186,991 in combined April 1989 Commerce Building tenant rentals and Randstone Parking Garage rentals [testimony of Mr. Goldman].

51. CSA, as well as most of the Commerce Building tenants, tendered its May 1989 rent to PAC before May 10, 1989 [testimony of Mr. Goldman].

52. PAC collected approximately $179,479 in combined May 1989 Commerce Building tenant rentals and Randstone Parking Garage rentals [testimony of Mr. Goldman].

53. PAC, through its property management company Transland, collected $59,443.19 in combined June 1989 Commerce Building tenant rentals and Randstone Parking Garage rentals [plaintiff's exhibit # 66, defendants' exhibit # 45]. However, PAC interpleaded $24,781.12 of those funds [$15,750.83 (Compass Property Management) + $7,184.50 (Kugle & Frederick) + $1,845.79 (Law Offices of Gregory Canfield) = $24,781.12] into the court registry per the Agreed Order dated June 4, 1990, thus in actuality it retained in its possession only $34,662.07, rather than $59,443.17, in Commerce Building tenant rentals and Randstone Parking Garage rentals for June 1989 [Agreed Order dated June 4, 1990; plaintiff's exhibit # 66, defendants' exhibit # 45].

54. Of the $34,662.07 in Commerce Building tenant rentals and Randstone Parking Garage rentals retained by PAC for June 1989, $32,416.99 is tenant rentals and $2,245.08 is parking rentals. These figures are derived by subtracting the parking rentals paid to PAC by Commerce Building tenants in June 1989 from the $34,662.07 figure [plaintiff's exhibit # 66, defendants' exhibits # 45 and # 66].

55. $2,245.08 in parking rentals were paid to PAC in June 1989 by Commerce Building tenants as follows: CIGNA ($00.00); S. Martinez ($70.20); G. Scazafana ($69.88); Baily & Williams ($140); Ramos & Toudouze ($210); and Green & McReynolds ($1,755) [plaintiff's exhibit # 66, defendants' exhibits # 45 and # 66].

56. PAC, through its property management Company Transland, collected $10,616.55 in Commerce Building tenant rentals and Randstone Parking Garage rentals for July 1989 [plaintiff's exhibit # 66, defendants' exhibit # 45].

57. Of the $10,616.55 in Commerce Building tenant rentals and Randstone Parking Garage rentals retained by PAC for July 1989, $10,196.35 is tenant rentals and $420.20 is parking rentals. These figures are derived by subtracting the parking rentals paid to PAC by Commerce Building tenants in July 1989 from the $10,616.55 figure [plaintiff's exhibit # 66, defendants' exhibits # 45 and # 66].

58. $420.20 in parking rentals were paid to PAC in July 1989, by Commerce Building tenants as follows: S. Martinez ($70.20); Baily & Williams ($140); and Ramos & Toudouze ($210) [plaintiff's exhibit # 66, defendants' exhibits # 45 and # 66].

59. $56,847.20 in Commerce Building tenant rentals and Randstone Parking Garage rentals were interpleaded into the court's registry by CSA/RTC, PAC and various Commerce Building tenants. However, the court ordered $2,500 in attorneys fees disbursed from these funds by the clerk of court

pursuant to the Agreed Order of June 4, 1990. Additionally, the clerk of court disbursed a registry fee of $459.83 from these funds on August 9, 1990. Thus, after deducting the plaintiffs' attorneys fee award and the registry fee, there remains $53,887.37, plus accrued interest, in interpleaded Commerce Building tenant rentals and Randstone Parking Garage rentals [Agreed Order dated June 4, 1990; Order dated August 9, 1990].

60. Of the original $56,847.20 in interpleaded funds consisting of both Commerce Building tenant rentals and Randstone Parking Garage rentals, $52,008.94 is tenant rentals and $4,838.26 is parking rentals. These figures are derived by subtracting the parking rentals paid by Commerce Building tenants interpleading funds from the $56,847.20 figure [plaintiff's exhibit # 66, defendants' exhibits # 45 and # 66, Agreed Order dated June 4, 1990].

61. $4,838.26 in parking rentals were interpleaded by Commerce Building tenants as follows: Compass Property Management ($1,610 for June 1989); Kugle & Frederick ($280 for June 1989); Law Offices of Gregory Canfield ($70 for June 1989); Green & McReynolds ($1,755 for July 1989); Law Offices of Harberger and Rodriguez ($210.63 for June 1989 and $210.63 for July 1989); Law Offices of C. Kendall Harrell, P.C. ($210.60 for June 1989 and $210.60 for July 1989); Seasons Cafe and Bakery ($70.20 for June 1989 and $70.20 for July 1989); and Jerry and Andrea Usrey, d/b/a Kwik–Kopy Kwik Kopy Printing # 99 ($70.20 for June 1989 and $70.20 for July 1989) [plaintiff's exhibit # 66, defendants' exhibits # 45 and # 66, Agreed Order dated June 4, 1990].

62. The $52,008.94 in interpleaded Commerce Building tenant rentals represents 91.-489% of the original total of $56,847.20 in interpleaded funds ($52,008.94 ÷ $56,847.20 = .91489) and the $4,838.26 in interpleaded Randstone Parking Garage rentals represents 8.511% of the original total of $56,-847.20 in interpleaded funds ($4,838.26 ÷ $56,847.20 = .08511). Therefore, of the $53,-887.37 in interpleaded funds remaining after the $459.83 registry fee and the $2,500 in attorneys fees were ordered deducted by the court, $49,301.02 represents tenant rentals [$52,008.94 − (.91489 × $459.83) − (.91489 × $2,500) = $49,301.02] and $4,586.35 represents parking rentals [$4,838.26 − (.08511 × $459.83) − (.08511 × $2,500) = $4,586.35] after deducting a proportional share of the registry fee and attorney fees deducted from the original $56,847.20 in interpleaded funds.

### A–2. Conclusions of Law and Analysis

CSA/RTC argues that the date of PAC's default was April 1, 1989. As support for this position, CSA/RTC points to Magistrate Judge Primomo's summary judgment Memorandum and Recommendation dated February 28, 1991, and Judge Prado's partial affirmance of that recommendation in his summary judgment order of October 8, 1992.

In his recommendation, Magistrate Judge Primomo wrote:

As identified by counsel for PAC I at the summary judgment hearing, four issues are involved.

(1) the right to office rental payments between April 1, 1989, the date of default, and August 1, 1989, the date of foreclosure. . . .

Magistrate Memorandum and Recommendation dated February 28, 1991, at 3. In his summary judgment order, Judge Prado concluded that the Magistrate's Recommendation concerning the Commerce Building tenant rentals issue "shall be accepted." Summary Judgment Order dated October 8, 1992, at 3. CSA/RTC argues that the above language from the magistrate's recommendation, coupled with Judge Prado's order, establishes that the date of default was April 1, 1989, and that such a finding is the law of the case. PAC cogently counters that both Magistrate Judge Primomo's and Judge Prado's decisions leave the issue of when PAC defaulted on its $24,300,000 primary note for resolution at trial. On this issue, I agree with PAC.

Reading both Magistrate Judge Primomo's recommendation and Judge Prado's summary judgment order as a whole, it is evident to me that both judges concluded that questions of fact precluded a determination of when PAC defaulted on its $24,300,000 primary note. It is noteworthy that Judge

Prado concluded his summary judgment order by granting summary judgment to CSA/RTC "on its claim of entitlement to the tenant rentals *between the date of PAC's default* and the date of foreclosure on August 1, 1989" (emphasis added). He expressly did not grant summary judgment to CSA/RTC on its claim for tenant rentals between April 1, 1989, and August 1, 1989, thus implying that the date of default was still an open question.

The findings of fact demonstrate that notice of default was given to PAC by CSA/RTC on April 27, 1989. PAC had until May 10, 1989, at 2:00 p.m. to cure its default. PAC failed to do so. Therefore, I conclude that PAC defaulted on its $24,300,000 primary note on May 10, 1989.

In accordance with Judge Prado's summary judgment order, I now find that CSA/RTC is entitled to all *tenant* rentals collected by PAC after May 10, 1989, and all June and July 1989 tenant rentals interpleaded into the court's registry. Thus, CSA/RTC is not entitled to the $186,991 in rentals collected by PAC for April 1989. CSA/RTC also failed to introduce any evidence that the $179,479 in rentals collected by PAC for May 1989 was collected after May 10, 1989, the date of default. Furthermore, CSA/RTC failed to identify what portion of the April and May 1989 rentals collected by PAC were parking rentals and which were tenant rentals. Therefore, CSA/RTC has failed to prove its entitlement to any tenant rentals for the months of April and May 1989. CSA/RTC is entitled to $32,416.99 plus pre- and postjudgment interest to compensate it for June 1989 tenant rentals collected by PAC (*see* findings of fact Nos. 53–55) and $10,196.35 plus pre- and postjudgment interest to compensate it for July 1989 tenant rentals collected by PAC (*see* findings of fact Nos. 56–58).

■ CSA/RTC is not barred from receiving prejudgment interest, even though it did not specifically ask for it in its complaint but only requested "such other relief, general or special, at law or in equity to which it may be entitled." *See Federal Sav. & Loan Ins. Corp. v. Texas Real Estate Counselors,* 955 F.2d 261, 270 (5th Cir.1992) (holding that

pleadings requesting "any other relief, both special and general to which it may be justly entitled" suffices to plead a claim for prejudgment interest).

■ State law, not federal law, governs the award of prejudgment interest. *Id.* Under Texas law, prejudgment interest "is recoverable as a matter of right when an ascertainable sum of money is determined to have been due and payable at a definite time prior to judgment." *San Antonio Villa Del Sole Homeowners Ass'n v. Miller,* 761 S.W.2d 460, 462 (Tex.Ct.App.1988). The court "does not have discretion to increase or reduce prejudgment interest." *Id. See also Richter, S.A. v. Bank of America Nat'l Trust and Sav. Ass'n,* 939 F.2d 1176, 1197 (5th Cir.1991) (noting that "under Texas law, prevailing parties receive prejudgment interest as a matter of course").

■ Pursuant to Texas law, "The rate of prejudgment interest shall be the same as the rate of postjudgment interest at the time of judgment and shall be computed as simple interest." Tex.Rev.Civ.Stat.Ann. art. 5069–1.05, § 6(g) (West 1993). Texas law sets the minimum postjudgment interest rate at 10% whenever the auction rate of 52–week treasury bills falls below 10% Tex.Rev.Civ.Stat. Ann. art. 5069–1.05, § 2 (West 1993). The most recent auction rate for 52–week treasury bills was 3.54% as computed on May 27, 1993. Therefore the applicable postjudgment interest rate, and hence prejudgment interest rate, under Texas law would be 10%. However, generally "state law cannot supplant the federal postjudgment interest statute." 28 U.S.C. § 1961; *Texas Real Estate Counselors,* 955 F.2d at 270.

■ The federal postjudgment interest statute, like the Texas postjudgment interest statute, also sets the postjudgment interest rate according to the auction rate of 52–week Treasury bills, but the federal statute does not have a 10% minimum floor like the Texas statute when the auction rate falls below 10%. *See* 28 U.S.C. § 1961. Thus, the applicable postjudgment interest rate, and hence prejudgment interest rate, under federal law, would be 3.54%.

To determine the appropriate prejudgment interest rate, the court must choose between either the Texas postjudgment interest rate of 10% or the federal postjudgment interest rate of 3.54%. The court of appeals for the fifth circuit recently confronted this issue and affirmed a federal district court's conclusion that the applicable prejudgment interest rate should be set equal to the Texas postjudgment interest rate. In so holding the court of appeals noted that:

> The Texas statute's difference from the federal formula clearly expresses the intent of the Texas legislature to provide to recovering plaintiffs a minimum ten percent judgment interest rate. Moreover, we are not persuaded that the Texas legislature intended to limit the recipient of a damages award to a prejudgment interest rate of less than the ten percent statutory minimum simply because its case was tried in federal court.

*Texas Real Estate Counselors*, 955 F.2d at 270. Therefore, I conclude that CSA/RTC is entitled to prejudgment interest calculated as simple interest at a rate of 10% on the $32,416.99 tenant rental damage award for June 1989 and on the $10,196.35 tenant rental damage award for July 1989.

Under Texas law, "prejudgment interest accrues on the amount of the judgment during the period beginning on the 180th day after the date the defendant receives written notice of a claim or on the day the suit is filed, whichever occurs first, and ending on the day preceding the date judgment is rendered." Tex.Rev.Civ.Stat.Ann. art. 5069-1.05, § 6(a) (West 1993). The original plaintiffs filed this action in state court on June 5, 1989. *See* Interpleader Petition filed with Notice of Removal dated October 6, 1989. The court finds June 5, 1989, to be the date on which PAC became aware of the dispute over Commerce Building tenant rentals. Therefore, CSA/RTC is entitled to prejudgment interest as of December 3, 1989, which is 180 days after June 5, 1989.

Since the date of the judgment is June 16, 1993, CSA/RTC is entitled to $11,456.97 in simple prejudgment interest on the $32,416.99 in June 1989 tenant rentals held by PAC [10% of $32,416.99 = $3,241.70; $3,241.70 (12–03–89 to 12–02–90) + $3,241.70 (12–03–90 to 12–02–91) + $3,241.70 (12–03–91 to 12–02–92) + {(195/365) × $3,241.70} (12–03–92 to 06–15–93) = $11,456.97] and $3,603.66 in simple prejudgment interest on the $10,196.35 in July 1989 tenant rentals held by PAC [10% of $10,196.35 = $1,019.64; $1,019.64 (12–03–89 to 12–02–90) + $1,019.64 (12–03–90 to 12–02–91) + $1,019.64 (12–03–91 to 12–02–92) + {(195/365) × $1,019.64} (12–03–92 to 06–15–93) = $3,603.66]. CSA/RTC is also entitled to postjudgment interest at a rate of 3.54% computed daily from the date of the judgment until the judgment is satisfied. *See* 28 U.S.C. § 1961; *Texas Real Estate Counselors*, 955 F.2d at 270 ("state law cannot supplant the federal postjudgment interest statute").

I will therefore direct the clerk of court to enter judgment awarding CSA/RTC $32,416.99 plus $11,456.97 in prejudgment interest and any applicable postjudgment interest at 3.54% to compensate it for the June 1989 tenant rentals collected and retained by PAC and $10,196.35 plus $3,603.66 in prejudgment interest and any applicable postjudgment interest at 3.54% to compensate it for the July 1989 tenant rentals collected and retained by PAC. Furthermore, I will direct the clerk of court to enter judgment awarding CSA/RTC $49,301.02 of the remaining interpleaded funds in the court's registry account, which represents the amount of June and July 1989 Commerce Building tenant rentals presently on deposit at the Frost National Bank, San Antonio, plus 91.489% of the accrued interest earned on the registry account since Commerce Building tenant rentals account for 91.489% of the original total of $56,847.20 in interpleaded funds (*see* findings of fact Nos. 59–62). In addition, CSA/RTC is entitled to any applicable postjudgment interest at 3.54% on this award.

## B. CSA/RTC's Breach of Contract Claim Against PAC for Commerce Building Tenant Rentals [C/R–RFR # 1]

CSA/RTC argues, in the alternative, that it is entitled to all the Commerce Building tenant rentals collected by PAC for the months of April, May, June and July 1989 based on PAC's alleged breach of contract. CSA/RTC

contends that PAC violated Articles 4.8 and 5.2(c) of the deed of trust.

*B–1.  Additional Findings of Fact*

63.  Article 5.2 of the deed of trust reads, in part, that:

> Grantor [PAC] hereby assigns to Holder [CSA/RTC] all Rental payable under each Lease now or at any time hereafter existing, such assignment being upon the following terms:  (a) until receipt by Lessee from Holder of notice of the occurrence of a default, each Lessee may pay Rental directly to Grantor, but after default Grantor covenants to hold all Rental so paid in trust for the use and benefit of Holder;  (b) upon receipt from Holder of notice that a default exists, each Lessee is hereby authorized and directed to pay directly to Holder all Rental thereafter accruing;  and the receipt of Holder shall be a release of such Lessee to the extent of all amounts so paid;  (c) Rental so received by Holder shall be applied by Holder, first to the expenses, if any, of collection and then in accordance with Section 4.8 [of the deed of trust]. . . .

Plaintiff's exhibit # 8 at 11.

64.  Article 4.8 of the deed of trust reads in part that:

> The proceeds from . . . any Rental collected by Holder [CSA/RTC] pursuant to Article V hereof . . . shall be applied by Trustee, or by Holder, as the case may be, as follows:  First, to the payment of all expenses . . . second, to accrued interest on the Secured Indebtedness;  third, to principal on the matured portion of the Secured Indebtedness. . . .

Plaintiff's exhibit # 8 at 10.

*B–2.  Conclusions of Law and Analysis*

■ CSA/RTC argues that *PAC* violated Articles 4.8 and 5.2(c) of the deed of trust when it failed to apply Commerce Building tenant rentals it collected for the months of April, May, June, and July 1989 to reducing the interest and principal owed on its loan with CSA/RTC.  Thus, CSA/RTC contends it is entitled to $436,529.72 in damages which is the amount of tenant rentals it alleges PAC collected and retained for the April 1, 1989,

to August 1, 1989, period [i.e. $186,991 for April 1989, $179,479 for May 1989;  $59,443.17 (actually $32,416.99) for June 1989; and 10,616.55 (actually $10,196.35) for July 1989].  *See* findings of fact Nos. 50, 52, 53–58.

CSA/RTC's argument has no merit.  Articles 4.8 and 5.2(c) of the deed of trust refer to the requirements of the Holder (i.e. CSA/RTC, *not* PAC) to apply Commerce Building tenant rentals collected by CSA/RTC after the date of default to reducing PAC's outstanding indebtedness.  PAC could not have conceivably violated these provisions of the deed of trust and therefore CSA/RTC cannot recover April, May, June and July 1989 Commerce Building tenant rentals collected and retained by PAC based on this theory of breach of contract.

*C.  CSA/RTC's Conversion Claim Against PAC [C/R–RFR # 5]*

CSA/RTC argues, again, apparently in the alternative, that it is entitled to the tenant rentals collected by PAC for April, May, June, and July 1989 under a conversion theory.  *See* findings of fact Nos. 50, 52, 53–58. CSA/RTC also seeks exemplary damages for PAC's alleged conversion of tenant rentals.

*C–1.  Conclusions of Law and Analysis*

■ Conversion "is the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights."  *Winkle Chevy–Olds–Pontiac, Inc. v. Condon,* 830 S.W.2d 740, 746 (Tex.Ct.App. 1992).  A plaintiff "need not establish that the defendant acted with a wrongful intent." *Id.*  Exemplary damages are only available for conversion if the unlawful act warranting actual damages was of a wanton or malicious nature.  *George Thomas Homes, Inc. v. Southwest Tension Systems, Inc.,* 763 S.W.2d 797, 800 (Tex.Ct.App.1988).

■ Judge Prado concluded that CSA/RTC was not entitled to Commerce Building tenant rentals collected and retained by PAC prior to the date of PAC's default.  This court has found the date of default to be May 10, 1989.  Consequently, tenant rentals collected by PAC prior to May 10, 1989, could

not have been converted by PAC because its collection of those funds would not amount to a "wrongful exercise of dominion and control over another's [CSA/RTC's] property...." because CSA/RTC had no legal right to those tenant rentals. Therefore, I conclude that CSA/RTC is not entitled to any of the $186,991 in April 1989 Commerce Building tenant rentals collected by PAC pursuant to a theory that PAC illegally converted those rentals. As to May 1989 tenant rentals collected by PAC, CSA/RTC failed to introduce any credible evidence as to what portion, if any, of the $179,479 in May rentals were received by PAC after May 10, 1989, or what portion of those rentals were tenant rentals as opposed to parking rentals. Thus, I also conclude that CSA/RTC has failed to prove a conversion claim with respect to the $179,479 in May 1989 tenant rentals collected by PAC.

■■■■ CSA/RTC arguably has a valid conversion claim for the Commerce Building tenant rentals collected by PAC for June and July of 1989. However, resolution of CSA/RTC's conversion claim—as an alternative theory of recovery of tenant rentals—is moot with respect to CSA/RTC's claim for June and July 1989 Commerce Building tenant rentals because CSA/RTC has already recouped these funds under its absolute assignment of rents theory of recovery discussed above in Part VI-A. CSA/RTC is not entitled to a double recovery. Finally, even if I were to award CSA/RTC the tenant rentals collected by PAC for June and July 1989 based on a theory of conversion rather than under the absolute assignment of rents theory of recovery, CSA/RTC would not be entitled to exemplary damages, because I do not find that PAC acted wantonly or maliciously in retaining those rentals during the genesis of this entire dispute. *See George Thomas Homes*, 763 S.W.2d at 797.

**D.  CSA/RTC's Conversion Claims Against Transland and Mr. Goldman [C/R-RFR #'s 26 and 27]**

CSA/RTC also brings conversion claims against Transland and Mr. Goldman to recover Commerce Building tenant rentals collected by PAC during April, May, June and July 1989. In addition, CSA/RTC requests exem-plary damages against Transland and Mr. Goldman for the alleged conversion of Commerce Building tenant rentals.

D-1.  *Additional Findings of Fact*

65.  Transland collected Commerce Building tenant rentals on behalf of PAC for the months of June and July 1989 [plaintiff's exhibit # 66 and defendants' exhibit # 45].

66.  Mr. Goldman transferred $100,000 from a Transland bank account to PAC Company on, or about, May 10, 1989, as reimbursement for a loan made by PAC Company to PAC [testimony of Mr. Goldman].

67.  Transland was PAC's agent for purposes of collecting and processing Commerce Building tenant rentals during the months of April, May, June, and July of 1989 and was acting within the scope of its employment for PAC in so collecting Commerce Building tenant rentals [plaintiff's exhibit # 66, defendants' exhibit # 45].

D-2.  *Conclusions of Law and Analysis*

Like CSA/RTC's conversion claim against PAC, and for the same reasons as discussed in Part VI-C-1, I find that neither Transland nor Mr. Goldman can be liable for conversion of Commerce Building tenant rentals collected by Transland on behalf of PAC prior to May 10, 1989. Thus, neither Transland nor Mr. Goldman is liable for converting the $186,991 in April 1989 rentals or the $179,479 in May 1989 rentals collected by Transland on behalf of PAC.

■■■ As to the $59,443.17 (actually $32,416.99) in June, 1989 Commerce Building tenant rentals and the $10,616.55 (actually $10,196.35) in July 1989 Commerce Building tenant rentals collected and retained by PAC, the evidence does demonstrate that Transland did exercise "dominion and control over another's [CSA/RTC's] property in denial of or inconsistent with" its rights because those monies belonging to CSA/RTC were collected by Transland on behalf of PAC after the May 10, 1989, default date. *See Condon*, 830 S.W.2d at 740; findings of fact Nos. 53–58. Therefore, I will direct the clerk of court to enter judgment jointly and severally against PAC and Transland for the $32,-

416.99 and $10,196.35 in June and July 1989 Commerce Building tenant rentals collected by Transland on behalf of PAC plus prejudgment interest as calculated in Part VI–A–2 and any applicable postjudgment interest. *See Equinox Enterprises v. Associated Media, Inc.,* 730 S.W.2d 872, 878 (Tex.Ct.App. 1987) (noting that "an agent may be held jointly and severally liable with his principal for torts that the agent commits while acting within the scope of his employment"). CSA/RTC is not entitled to exemplary damages against Transland for conversion, however, because I do not find that Transland acted wantonly or maliciously in collecting Commerce Building tenant rentals for June and July 1989. *See George Thomas Homes,* 763 S.W.2d at 797.

Turning to Mr. Goldman, I find no evidence demonstrating that he, acting as agent of PAC, personally exercised "dominion or control" over the funds collected by Transland after May 10, 1989. The evidence suggests that the June and July 1989 rentals were collected solely by Transland on behalf of PAC and not by Mr. Goldman personally.

As to CSA/RTC's allegations that Mr. Goldman converted $100,000 from a Transland bank account on May 10, 1989, by transferring those funds to PAC Company, I find that CSA/RTC has failed to demonstrate that this event occurred *after* May 10, 1989, the date of default, or that the funds actually transferred were Commerce Building tenant rentals. CSA/RTC also failed to introduce any proof of wantonness or maliciousness on the part of Mr. Goldman to support its request for exemplary damages for Mr. Goldman's alleged conversion of tenant rentals. Therefore, I conclude that Mr. Goldman is not liable for conversion, and I will direct the clerk of court to enter judgment dismissing CSA/RTC's conversion claim against Mr. Goldman, with prejudice and with costs.

### E. PAC's Claim for Equitable Reimbursement [P–RFR # 14]

██ PAC contends that it is entitled to $116,000 in damages as equitable reimbursement for operating expenses it incurred between May 10, 1989, the date of default, and August 1, 1989, the date of CSA/RTC's fore-

closure of its deed of trust lien on the Commerce Building. CSA/RTC contends that PAC was obligated, prior to foreclosure, to pay the expenses associated with operating the Commerce Building and that its claim for equitable reimbursement is barred both by the doctrine of unclean hands and PAC's failure to "plead or prove it exhausted the administrative claims process" with the RTC as required by 12 U.S.C. § 1821(d)(3).

### E–1. Additional Findings of Fact

68. Article 4.1(*o*) of the loan agreement executed by CSA and PAC states that "Until payment and performance in full of the Loans, Borrower [PAC] covenants and agrees to ... [p]romptly pay or cause to be paid when due all costs and expenses incurred in connection with the Property...." [plaintiff's exhibit # 5 at 5–6].

69. Article 2.2(i) of the deed of trust executed by PAC requires "Grantor [PAC], for Grantor and Grantor's successors and assigns, covenants and agrees ... to pay promptly all bills for labor and materials incurred in connection with the Mortgaged Property...." [plaintiff's exhibit # 8 at 3–4].

70. Article 2.2(r) of the deed of trust executed by PAC requires "Grantor [PAC], for Grantor and Grantor's successors and assigns, covenants and agrees ... to perform punctually and properly all of Grantor's covenants, duties and liabilities under any other security agreement, mortgage, deed of trust, collateral pledge agreement, loan agreement or assignment of any kind now or hereafter existing as security for or in connection with payment of the Secured Indebtedness...." [plaintiff's exhibit # 8 at 1 and 5].

71. Article 3.2 of the deed of trust executed by PAC states that "If Grantor [PAC] should fail to keep or perform any covenant whatsoever contained in this Deed of Trust, then Holder [CSA/RTC], after notice to Grantor, may, but shall not be obligated to any person to do so, perform or attempt to perform said covenant, *and any such payment so made or expense incurred* in the performance or attempted performance of any such covenant shall be a part of the indebtedness hereby secured, and Grantor

promises, upon demand, to pay to the Holder at the office of Holder in Holder's city, all sums so advanced or paid by the Holder . . . ." (emphasis added) [plaintiff's exhibit # 8 at 6].

72. Article 4.6(iii) of the deed of trust executed by PAC states that "Grantor [PAC] covenants to promptly reimburse and pay to Holder [CSA/RTC], at the place where the note is payable . . . *the amount of all reasonable expenses . . . incurred by Holder* in connection with custody, preservation, use or operation of the Mortgaged Property, together with interest thereon from the date incurred by Holder until repaid by Grantor at the Default Rate. . . ." (emphasis added) [plaintiff's exhibit # 8 at 9].

E–2. *Conclusions of Law and Analysis*

CSA/RTC argues that PAC failed to "plead or prove it exhausted the administrative claims process" pursuant to 12 U.S.C. § 1821(d)(3) and that PAC is guilty of unclean hands; I do not regard these contentions sufficient to preclude PAC from obtaining equitable reimbursement. Nevertheless, I do not believe PAC is entitled to the $116,000 in damages it requests as relief for Commerce Building operating expenses incurred between May 10, 1989, and August 1, 1989.

The loan agreement along with the deed of trust suggest that even if CSA/RTC had incurred the Commerce Building operating expenses that PAC claims to have absorbed during the summer of 1989, CSA/RTC would have been entitled to reimbursement from PAC for such expenses incurred. *See* findings of fact Nos. 68–72. Therefore, I conclude that PAC does not have a valid claim for reimbursement of the operating expenses it allegedly incurred because it would have been obligated to pay such expenses even if CSA/RTC had originally borne those expenses. PAC has pointed to no language in the various documents memorializing the December 1985 Commerce Building transaction that suggest otherwise.

Additionally, at trial, PAC introduced no evidence documenting its alleged $116,000 claim for Commerce Building operating expenses for the May 10, 1989, to August 1, 1989, period. The only testimony relating to this issue was from Mr. Goldman who indicated only, in general terms, that PAC paid the operating expenses of the Commerce Building prior to CSA/RTC's foreclosure on August 1, 1989. Thus, I conclude that PAC is not entitled to equitable reimbursement of $116,000.

*F. CSA/RTC's and PAC's Competing Claims for Ownership of the Randstone Leasehold Interest [C/R–RFR # 7, P–RFR # 's 1 and 2]*

Both CSA/RTC and PAC assert ownership of the Randstone leasehold interest. *See* plaintiff's exhibit # 1. CSA/RTC claims it obtained ownership of the Randstone leasehold interest when it foreclosed its deed of trust lien on the Commerce Building (*see* plaintiff's exhibit # 8), which, it argues, includes the Randstone leasehold interest as collateral for PAC's indebtedness to CSA/RTC. PAC argues that the Randstone leasehold interest is not included as collateral in the deed of trust and that it owns the Randstone leasehold interest free and clear pursuant to the blanket conveyance, bill of sale and assignment and assumption agreement executed between CSC and PAC in December 1985. *See* plaintiff's exhibit # 2.

CSA/RTC first contends that the deed of trust includes unambiguous language broad enough to include the Randstone leasehold interest as collateral for its loans to PAC [the Non-ambiguity Theory]. In the alternative, CSA/RTC argues that the Randstone leasehold interest is an appurtenance to the Commerce Building and therefore is expressly included as collateral, in the deed of trust, for its loan to PAC [the Appurtenance Theory].

In case of an unfavorable result on the above two arguments, CSA/RTC next puts forth a series of alternative theories of ownership in the Randstone leasehold interest which include its contention that it has an express vendor's lien on the Randstone leasehold interest arising from the special warranty deed conveying the Commerce Building from CSC to PAC [the Express Vendor's Lien Theory], or, an implied vendor's lien on the Randstone leasehold interest arising by operation of law [the Implied Vendor's Lien

Theory], or that it is entitled to reformation of the deed of trust and/or special warranty deed to include expressly the Randstone leasehold interest as collateral for its loan to PAC [the Reformation Theory].

### F-1. *Additional Findings of Fact—Non-ambiguity Theory*

73. The deed of trust executed by PAC states in part that PAC:

has Granted, Bargained, Sold and Conveyed and by these presents does hereby Grant, Bargain, Sell and Convey unto John Steen, Jr. ... all that certain lot, tract or parcel of land lying and being situated in the County of Bexar, State of Texas, as more fully described in Exhibit A attached hereto and incorporated by reference for all purposes, together with all improvements thereon and hereafter placed thereon, and all equipment, apparatus, fixtures, inventory, and all other property, now or hereafter belonging to Grantor [PAC] and now or hereafter installed, used or situated on the real property herein described or the improvements thereon, including, but not limited to, all heating, lighting, refrigeration, plumbing ... and such other goods and chattels and personal property as are ever used or furnished in operating a building or buildings or in conducting any activity therein, upon the real property herein described, and all renewals, replacements and substitutions thereof and additions and accessions thereto, whether or not the same are or shall be attached to the realty in any manner ... and together will all other interest of every kind and character in and to the real property herein described which the Grantor [PAC] now owns or at any time hereafter acquires.

All property above described (whether one or more tracts and whether real and personal property or only realty or only personalty), together with any additional interest thereon now owned or hereafter acquired by Grantor, is referred to below as *"Mortgaged Property"*.

TO HAVE AND TO HOLD the Mortgaged Property, together with all the rights, hereditaments and appurtenances now, or hereafter, at time before the fore-closure hereof, in any wise appertaining or belonging thereto, unto the said Trustee ... against the lawful claim or claims arising by, through, or under Grantor [PAC], but not otherwise.

Plaintiff's Exhibit # 8 at 1-2.

74. The special warranty deed executed by CSC does not specifically refer to CSC conveying the Randstone leasehold interest to PAC [plaintiff's exhibit # 18].

75. The blanket conveyance, bill of sale, assignment, and assumption agreement executed by CSC and PAC grants and conveys CSC's ownership of the Randstone leasehold interest to PAC [plaintiff's exhibit # 2].

76. The financing statement signed by both CSA/RTC and PAC states, in part, that:

This Financing Statement covers the following types or items of collateral and/or property: Debtor's [PAC's] interest in all goods, wares, equipment ... together with all of Debtor's [PAC's] interest and rights in any contracts, agreements or the like covering, incident or pertaining to such real property, including any construction contracts, architect contracts, plans and specifications, or parking agreements.

Plaintiff's exhibit # 13.

### F-2. *Conclusions of Law and Analysis—Non-ambiguity Theory*

■ CSA/RTC argues that the deed of trust is not an ambiguous document and that its language expressly ***includes*** the Randstone leasehold interest as collateral for its $27,000,000 loan to PAC. PAC agrees that the deed of trust is not ambiguous, but it argues that the deed of trust unambiguously ***does not include*** the Randstone leasehold interest.

■ In deciding whether the deed of trust is ambiguous, "separate documents executed at the same time, for the same purpose, and in the course of the same transaction, are to be construed together." *Jim Walter Homes, Inc. v. Schuenemann,* 668 S.W.2d 324, 327 (Tex.1984). A contract is unambiguous when "it is reasonably open to just one interpretation given the rules of interpretation and the surrounding circum-

stances." *Hanssen v. Qantas Airways Ltd.*, 904 F.2d 267, 269 (5th Cir.1990).

As a preliminary matter, Judge Prado found the deed of trust and other contract documents to be ambiguous on the issue of whether the Randstone leasehold interest was included as collateral in the deed of trust. *See* Summary Judgment Order dated October 8, 1992, at 5. This finding is arguably law of the case. *See Horton*, 622 F.2d at 148. Even if it were not, I too find the language in the deed of trust to be ambiguous as to whether a security interest in the Randstone leasehold interest was given by PAC to CSA/RTC.

The deed of trust does not specifically refer to the Randstone leasehold interest. The language in the deed of trust granting to CSA/RTC "all other interest of every kind and character in and to the real property herein described" is, in my opinion, ambiguous as to whether that language was intended as a mere catch-all for other items such as "pumps, motors, compressors, etc." not specifically listed in the deed of trust or, on the other hand, was meant as a far broader catch-all—namely, to encompass such property interests as the Randstone leasehold interest which is very different from the items specifically listed in the deed of trust.

The other documents memorializing the transaction add to the ambiguity of whether CSA/RTC retained a security interest in the Randstone leasehold interest. The special warranty deed executed by CSC makes no reference to the Randstone leasehold interest. *See* plaintiff's exhibit # 18. However, the blanket conveyance, bill of sale, assignment, and assumption agreement between CSC and PAC expressly assigns CSC's ownership of the Randstone leasehold interest to PAC, along with several other property interests in which CSA/RTC did explicitly retain a security interest as described in the deed of trust. Furthermore, the financing statement, signed by both PAC and CSA/RTC, although not an instrument that creates a security interest, does refer to "parking agreements." Consequently, I conclude that the documents memorializing the transaction between CSA/RTC and PAC are, indeed, ambiguous as to the retention by CSA/RTC of a security interest in the Randstone leasehold interest.

### F-3. *Additional Findings of Fact—Appurtenance Theory*

77. The Randstone Parking Garage is not physically attached to the Commerce Building [testimony of Ronald Williams; defendants' exhibits D-47 to D-53].

78. The Randstone Parking Garage Agreement obligates the owner of the leasehold interest created in that agreement to lease 260 parking spaces in the Rand Parking Garage from the Randstone Venture through the year 2002 [plaintiff's exhibit # 1].

79. There are other parking facilities, other than the Randstone Parking Garage, located in close proximity to the Commerce Building [testimony of Mr. Williams; defendants' exhibits D-54 to D-57].

80. Some of the Commerce Building tenant leases require the owner of the Commerce Building to provide parking spaces in the Randstone Parking Garage to Commerce Building tenants [POS 5.23; plaintiff's exhibit # 14].

81. Some of the tenants at the Commerce Building did not lease parking space at the Randstone Parking Garage [plaintiff's exhibit # 66, defendants' exhibits # 45 and 66].

82. The standard parking rider to Commerce Building leases provides for two parking spaces per 1,000 square feet of office space leased to Commerce Building tenants. The parking rider states, however, that "in the event other tenants in the [Commerce Building] require the use of more spaces than are available in the Parking Garage, Landlord [CSA/RTC after default] shall have the right to reduce the number of spaces available to [tenants] to one (1) space per thousand [square feet]." [plaintiff's exhibit # 14].

83. Many employees of tenants in the Commerce Building were not provided with parking spaces in the Randstone Parking Garage [testimony of Mr. Williams; plaintiff's exhibit # 14].

### F–4. Conclusions of Law and Analysis— Appurtenance Theory

CSA/RTC argues, in the alternative to its non-ambiguity theory, that the Randstone leasehold interest is an appurtenance to the Commerce Building, and therefore it is expressly included as collateral in the deed of trust lien that CSA/RTC foreclosed upon on August 1, 1989. An appurtenance " 'means and includes all rights and interests in other property that are necessary for full enjoyment of the property conveyed and which [are] used as necessary incidents thereto.' " *Pine v. Gibraltar Sav. Ass'n*, 519 S.W.2d 238, 241 (Tex.Civ.App. 1974). Nothing will "pass by the term 'appurtenances,' except such land as is indispensable to the use and enjoyment of the property conveyed." *Ogden v. Jones*, 37 S.W.2d 777, 780 (Tex.Civ.App.1931).

CSA/RTC contends the Randstone leasehold interest is an appurtenance because the owner of the Commerce Building cannot operate the Commerce Building successfully, and hence fully enjoy its use, without the corresponding ability to provide parking to its tenants. PAC counters that the Randstone leasehold interest is not an appurtenance because there is other available parking near the Commerce Building that is open to Commerce Building tenants; it also urges that not every tenant leases parking space in the Randstone Parking Garage, thus negating CSA/RTC's argument that such parking space is necessary and indispensable to the full use and enjoyment of the Commerce Building.

In my opinion the Randstone leasehold interest is not fairly to be labelled an appurtenance to the Commerce Building, and therefore the Randstone leasehold interest is not to be regarded as included collateral in the deed of trust. I reach this conclusion because the Randstone leasehold interest simply is not a property interest necessary to ensure that the Commerce Building performs its intended function of providing office space.

While it is undoubtedly true that providing parking at the Randstone Parking Garage to Commerce Building tenants is an inducement to encourage prospective tenants to sign Commerce Building leases, the evidence demonstrates that not all Commerce Building tenants and their employees do, or can, park at the Randstone Parking Garage. Only a few Randstone Parking Garage spaces were allotted to each tenant; thus many employees of Commerce Building tenants had to look elsewhere to find parking. This demonstrates to me that ownership of the Randstone leasehold interest is not absolutely required to enable the owner of the Commerce Building successfully to find tenants for the Commerce Building. Thus, I am unable to support the contention of CSA/RTC that the Randstone leasehold interest is an appurtenance necessary to the "full enjoyment" of the Commerce Building by the owner of that property.

### F–5. Additional Findings of Fact—Express Vendor's Lien Theory

84. The special warranty deed executed by CSC shows that CSC retained an express vendor's lien against the Commerce Building and its appurtenances as security to ensure payment by PAC of its $2,700,000 and $24,-300,000 promissory notes given to CSA/RTC in exchange for CSA/RTC's $27,000,000 loan that financed PAC's $24,000,000 purchase of the Commerce Building and that provided PAC with $3,000,000 for tenant finish improvements [plaintiff's exhibits # 5 at 2 and # 18].

85. The special warranty deed executed by CSC states that the express vendor's lien retained by CSC was "transferred, assigned, sold and conveyed" to CSA and CSA's "successors and assigns" [plaintiff's exhibit # 18].

86. None of the $27,000,000 borrowed by PAC from CSA was used to purchase the Randstone leasehold interest conveyed to PAC by CSC in the blanket conveyance, bill of sale, assignment and assumption agreement [plaintiff's exhibit # 5 at 2].

### F–6. Conclusions of Law and Analysis— Express Vendor's Lien Theory

CSA/RTC argues that it owns the Randstone leasehold interest pursuant to an express vendor's lien retained in the special warranty deed conveying the Commerce

Building, along with all appurtenances, from CSC to PAC. CSA/RTC presently seeks judicial foreclosure of that express vendor's lien.

■ A vendor's lien is a lien for purchase money. *Manz v. Johnson*, 531 S.W.2d 934, 936 (Tex.Civ.App.1976). A vendor's lien is clearly assignable and when assigned, the lien follows the debt and is enforceable by a third party. *Cebell v. Hauser*, 112 S.W.2d 285, 286–87 (Tex.Civ.App.1937). CSA/RTC argues that it has an express vendor's lien against the Randstone leasehold interest because it is an appurtenance—a property interest expressly included in the vendor's lien described in the special warranty deed and retained by CSC and ultimately assigned to CSA. Thus, CSA/RTC argues, it has a valid lien against the Randstone leasehold interest since the purchase money borrowed from CSA/RTC to finance PAC's purchase of the items included in the special warranty deed never was fully repaid.

I disagree with CSA/RTC's contentions. An express vendor's lien does exist against the Commerce Building and its improvements and appurtenances. However, no express vendor's lien exists against the Randstone leasehold interest since the Randstone leasehold interest is not an appurtenance. It follows that the special warranty deed between CSC and PAC does not give CSA/RTC an express vendor's lien against the Randstone leasehold interest nor the possibility of ownership of it upon judicial foreclosure of the express vendor's lien that was retained in the special warranty deed assigned by CSC to CSA.

### F–7. *Conclusions of Law—Implied Vendor's Lien Theory*

CSA/RTC next contends that it owns the Randstone leasehold interest pursuant to an implied vendor's lien arising by operation of law. PAC argues that a lien on the Randstone leasehold interest was not intended by the parties and that no implied vendor's lien was created.

■ Under Texas law, "when no express lien is reserved in a deed and the purchase money is not paid, a lien nevertheless arises by implication in favor of the vendor to secure payment of the purchase money." *McGoodwin v. McGoodwin*, 671 S.W.2d 880, 882 (Tex.1984). An implied vendor's lien " 'exists in every case of sale where the money is not paid, unless it be otherwise agreed by the parties either expressly or by acts showing that the lien was not intended to be retained.... *Prima facie* the lien exists and it lies on the purchaser to show that the vendor agreed to waive it.' " *McGoodwin*, 671 S.W.2d at 882 (citing *Briscoe v. Bronaugh*, 1 Tex. 326, 329–30 (1846)).

■ I can find no credible evidence in the record that CSA, as the assignee of CSC, or CSC, the vendor of the Commerce Building, "agreed to waive" the implied vendor's lien that arose by operation of law to secure the loan made to PAC to purchase the Commerce Building. However, the evidence demonstrates that the implied vendor's lien retained by CSA/RTC arises only as to the Commerce Building, appurtenances and improvements thereon and not as to the Randstone leasehold interest; none of the $27,000,000 in purchase money evidenced by PAC's two promissory notes made payable to CSA was used to purchase the Randstone leasehold interest but, rather, was used solely to purchase the Commerce Building, and its appurtenances and improvements thereon, along with money to complete tenant finish improvements on the building. *See* findings of fact Nos. 21–24, 86. The parties did not intend that an implied vendor's lien would arise in the Randstone leasehold interest because no purchase money was used to buy the Randstone leasehold interest. Therefore, I conclude that CSA/RTC does have an implied vendor's lien on the Commerce Building and its appurtenances and improvements thereon but not on the Randstone leasehold interest. Consequently, no implied vendor's lien against the Randstone leasehold interest exists for CSA/RTC to foreclose upon, and CSA/RTC cannot claim ownership of the Randstone leasehold interest pursuant to this theory.

### F–8. *Findings of Fact—Reformation Theory*

87. Glenn West intended the Randstone leasehold interest to be collateral for the

$27,000,000 loan from CSA to PAC, and he believed that the documents memorializing the Commerce Building sale transaction accurately reflected that intent. Mr. West did not believe a mistake was made in the preparation of the Commerce Building transaction documents [testimony of Mr. West].

88. Roger Harrison believed that no mistakes were made in the documentation memorializing the sale of the Commerce Building from CSC to PAC in December 1985, and he believed that the Randstone leasehold interest was included as collateral in the deed of trust executed by PAC [deposition testimony of Mr. Harrison, p. 410, lines 12–15, p. 414, lines 15–25].

89. Gerald Stool believed that the closing documents embodied the intent of the parties and that no mistakes were made by either CSA or PAC as far as he knew [deposition testimony of Mr. Stool, p. 24, lines 1–12].

90. Gerald Stool thought that the Randstone leasehold interest was collateral for the $24,300,000 primary loan made by CSA to PAC [deposition testimony of Mr. Stool, p. 20, lines 9–20].

91. Donald Goldman did not intend the Randstone leasehold interest to serve as collateral for the $27,000,000 loan from CSA to PAC, and he believed that PAC owned the Randstone leasehold interest free and clear after CSC conveyed it to PAC in the blanket conveyance, bill of sale, assignment and assumption agreement [testimony of Mr. Goldman].

92. PAC's attorney, John Reoch, had no recollection of the Randstone leasehold interest's being discussed as collateral for the $27,000,000 loan from CSA to PAC [deposition testimony of Mr. Reoch, p. 33, lines 2–23].

93. John Reoch believed that it was not PAC's intent to include the Randstone leasehold interest as security for the $27,000,000 loan made from CSA to PAC [deposition testimony of Mr. Reoch, p. 56, lines 18–22].

**F–9.** *Conclusions of Law and Analysis— Reformation Theory*

CSA/RTC's final argument is that it is entitled to reformation of the deed of trust and/or the special warranty deed to include the Randstone leasehold interest as security for the loan made to PAC and evidenced by the two promissory notes executed by PAC totalling $27,000,000 and made payable to CSA. CSA/RTC asserts mutual mistake or unilateral mistake by it as grounds for reformation.

A party seeking reformation must prove: (1) a mutual mistake of fact between the parties which (2) renders the contract unreflective of or contrary to the parties' intent, and (3) the existence of extrinsic evidence which does accurately reflect the parties' intent. *Matter of Coral Petroleum, Inc.,* 878 F.2d 830, 834 (5th Cir.1989). The underlying objective of reformation "is to correct a mutual mistake in *preparing* a written instrument, so that the instrument truly reflects the *original* agreement of the parties." *Cherokee Water Co. v. Forderhause,* 741 S.W.2d 377, 379 (Tex.1987).

Under Texas law, "a unilateral mistake is insufficient to warrant setting the contract aside unless the mistake is induced by acts of the other party." *Interfirst Bank of Abilene, N.A. v. Lull Mfg.,* 778 F.2d 228, 232 (5th Cir.1985). An exception to this rule exists where "1) the mistake is of so great a consequence as to make enforcement of the contract unconscionable; 2) the mistake relates to a material feature of the contract; and 3) the mistake is made regardless of the exercise of ordinary care." *Id.*

The evidence strongly suggests that there was no mutual mistake by CSA/RTC and PAC which would entitle CSA/RTC to reformation of either the deed of trust or the special warranty deed. CSA/RTC's own witnesses testified that the documents memorializing the Commerce Building transaction were not drafted in error. Furthermore, all of the persons involved in the deal for CSA/RTC, namely, Mr. West, Mr. Harrison and Mr. Stool, said they intended to retain a security interest in the Randstone leasehold interest whereas the players for PAC, Mr. Goldman and Mr. Reoch, said they intended to receive the Randstone leasehold interest free and clear.

CSA/RTC has not demonstrated a unilateral mistake entitling it to reformation of the

deed of trust or of the special warranty deed. I note, once again, that the negotiators for CSA/RTC testified that they did not believe any mistake was made—unilateral or otherwise. Furthermore, the question as to whether the Randstone leasehold interest was collateral for CSA's loans to PAC was not "a material feature of the contract" between CSA/RTC and PAC; nor would it be unconscionable, in my opinion, to enforce the contract between CSA/RTC and PAC without reformation. CSA/RTC was represented by counsel and sophisticated negotiators, and any mistake made by it with respect to the Randstone leasehold interest should have been remedied by the exercise of ordinary care during the closing of the transaction.

I conclude that there was neither a mutual mistake or the type of unilateral mistake made by CSA/RTC that entitles CSA/RTC to reformation. In my opinion, **both** parties to the transaction at the time of contracting did not mutually agree to include the Randstone leasehold interest as collateral for the $27,-000,000 loan from CSA to PAC. It follows that CSA/RTC does not own the Randstone leasehold interest pursuant to reformation of the deed of trust lien foreclosed upon on August 1, 1989; nor is it entitled to judicial foreclosure of a reformed special warranty deed.

### F–10. *Conclusion*

CSA/RTC has failed to present any theory to demonstrate that it owns the Randstone leasehold interest. In my opinion, the Randstone leasehold interest was conveyed to PAC free and clear in the blanket conveyance, bill of sale, assignment and assumption agreement. Therefore, I will direct the clerk of court to enter a declaratory judgment that PAC is the owner of the Randstone leasehold interest.

### G. *CSA/RTC's and PAC's Competing Claims for Parking Rentals Generated Through Ownership of the Randstone Leasehold Interest [C/R–RFR # 8, P–RFR # 's 3, 4, 5 and 12 (to the extent they relate to parking rentals), 6, 11, 13]*

Both CSA/RTC and PAC claim entitlement to parking rentals arising from each party's respective claimed ownership of the Randstone leasehold interest. The parking rentals at issue include those interpleaded by Commerce Building tenants, those held by CSA/RTC and those held by PAC.

In Part VI–F above, I found that PAC owns the Randstone leasehold interest. Nevertheless, CSA/RTC contends that it is still entitled to parking rentals generated from the Randstone Parking Garage pursuant to the assignment of rentals provision in the loan agreement and to the offset provision in that same document. On the other hand, PAC claims that it is entitled to the parking rentals, based on the wrongful interception of parking rentals by CSA/RTC, CSA/RTC's breach of contract and CSA/RTC's intentional interference with PAC's lease contracts with Commerce Building tenants.

### G–1. *Additional Findings of Fact*

94. Of the total money interpleaded into the court's registry, $4,586.35 represents Randstone Parking Garage rentals for June and July 1989 after deducting a proportionate share of the registry fee and attorneys fees awarded to the original plaintiffs dismissed from this action [*see* findings of fact Nos. 60–62].

95. PAC collected a total of $2,245.08 in June 1989 Randstone Garage Parking rentals and $420.20 in July 1989 parking rentals [*see* findings of fact Nos. 54–58].

96. Between June 1989 and December 1990, CSA/RTC collected $274,786.72 in Randstone Parking Garage rentals [defendants' exhibit # 66].

97. Article 5.1 of the deed of trust states:

As used in this Deed of Trust: (a) *"Lease"* means any lease, sublease or other agreement under the terms of which any person other than Grantor has or acquires any right to occupy or use the Mortgaged Property, or any part thereof, or interest therein; (b) *"Lessee"* means the lessee, sublessee, tenant or other person having the right to occupy or use a part of the Mortgaged Property under a Lease; and

(c) *"Rental"* means the rents royalties and other consideration payable to Grantor by the Lessee under the terms of a Lease.

Plaintiff's exhibit #8 at 11.

98. Article 7.6 of the loan agreement states that:

Borrower [PAC] hereby grants to Lender [CSA/RTC] a right of offset, to secure the repayment of the Loans, upon any and all monies, securities or other property of Borrower, and the proceeds therefrom, now or hereafter held or received by or in transit to Lender, from or for the account of Borrower, whether for safekeeping, custody, pledge, transmission, collection or otherwise, and also upon any and all deposits (general or special) and credits of Borrower, *and any and all claims of Borrower against Lender at any time existing.* Upon the occurrence of Default, Lender is hereby authorized at any time and from time to time, without notice to Borrower, to offset, appropriate, apply and enforce said liens against any all items hereinabove referred to against the Loans.

Plaintiff's exhibit #5 at 13–14 (emphasis added).

99. Article 8.1 of the loan agreement states in part that:

[T]he recourse of the Lender [CSA/RTC] shall be by judicial foreclosure or by the exercise of Trustee's power of sale, or other remedies set forth in the Deed of Trust or other Loan Papers ... there shall be no partnership or personal liability of Borrower [PAC], or any of its general partners ... for the payment of principal or interest or other amounts which may become due and payable on or under the terms of the Notes or the Loan Papers.

Plaintiff's exhibit #5 at 15.

100. Article 8.2 of the loan agreement states in part that:

Nothing contained in this Article Eight shall be deemed to prejudice the rights of Lender ... In addition, nothing contained herein shall ... (e) limit or otherwise prejudice in any way the rights of Lender to enforce any of its other rights or remedies under the Notes or under the Deed of Trust or any other of the Loan Papers ...

Plaintiff's exhibit #5 at 16.

101. PAC, Transland and Mr. Goldman incurred no personal liability on the $2,700,-000 and $24,300,000 promissory notes although the loan agreement contains exceptions to the nonrecourse nature of the notes [POS 5.22].

*G–2. Conclusions of Law and Analysis*

■ CSA/RTC argues that it is entitled to all Randstone Parking Garage rentals pursuant to the assignment of rentals provision in the deed of trust that Judge Prado held to be an absolute assignment of rentals provision. This argument fails, however, because I find that the assignment of rentals provision is defined only to include Commerce Building tenant rentals and does not include Randstone Parking Garage rentals. *See* finding of fact No. 97.

■ CSA/RTC also maintains that it is entitled to the Randstone Parking Garage rentals pursuant to the right of offset provision in the loan agreement. I find that the right of offset provision coupled with Article 8.2 of the loan agreement (the exception clause to the nonrecourse nature of the loans by CSA/RTC to PAC) entitles CSA/RTC to all Randstone Garage parking rentals because PAC has failed entirely to pay off its loan to CSA/RTC. *See* finding of fact No. 38. PAC has raised no arguments contradicting this conclusion. Consequently, it is unnecessary to consider PAC's arguments to recover the parking rentals because even if PAC were to prevail, CSA/RTC would be entitled to offset the parking rentals it owed to PAC against the loan balance still due from PAC. *See* finding of fact No. 98.

I will therefore direct the clerk of court to enter a declaratory judgment that all Randstone Parking Garage rentals collected by CSA/RTC to date are properly retained by it pursuant to its right of offset in its loan agreement with PAC. Furthermore, I will direct the clerk of court to enter judgment in favor of CSA/RTC awarding it $4,586.35 of the remaining interpleaded funds in the court's registry account, which represents

the amount of June and July 1989 Randstone Garage Parking rentals presently on deposit at the Frost National Bank, San Antonio, plus 8.511% of the accrued interest earned on the registry account and any applicable post-judgment interest at 3.54% pursuant to 28 U.S.C. § 1961. *See* finding of fact No. 62.

I will also direct the clerk of court to enter judgment jointly and severally against PAC and Transland awarding CSA/RTC $2,665.28 [$2,245.08 (June 1989) + $420.20 (July 1989)] in parking rentals collected by PAC during June and July 1989 plus $941.98 in prejudgment interest, *see* findings of fact Nos. 55 and 58; Part VI-A-2, [10% of $2,665.28 = $266.53; $266.53 (12–03–89 to 12–02–90) + $266.53 (12–03–90 to 12–02–91) + $266.53 (12–03–91 to 12–02–92) + { (195/365) × $266.53} (12–03–92 to 06–15–93) = $941.98] and applicable postjudgment interest at 3.54% pursuant to 28 U.S.C. § 1961. I find that Transland is also liable for the parking rentals collected and retained by PAC just as I found it liable for the tenant rentals collected by PAC based on a theory of conversion. *See* Part VI-D-2.

### H. The Intervenor's Claim for Utility Services

CPSB alleges that it is entitled to $38,-558.33 out of the tenant and parking rentals interpleaded into the court's registry as compensation for utility services provided to the Commerce Building during the months of June and July 1989. CPSB contends it is entitled to this money based on an equitable lien arising by operation of law. CPSB also seeks attorneys fees and costs.

H–1. *Conclusions of Law and Analysis*

██ CPSB contends it has an equitable lien on the Commerce Building tenant rentals and the Randstone Parking Garage rentals interpleaded by Commerce Building tenants into the court's registry. CPSB cites *Matter of Daves* for the proposition that "An equitable lien may, in a proper case, arise when circumstances indicate that parties intended specific property to secure payment of a debt." 770 F.2d 1363, 1367 (5th Cir. 1985).

CPSB had a contract with PAC to provide utility service to the Commerce Building. *See* finding of fact # 32. I find no evidence in the record indicating that CPSB and PAC intended Commerce Building tenant rentals and Randstone Parking Garage rentals to be security for the unpaid Commerce Building utility bills for June and July 1989. Furthermore, I have concluded that the interpleaded Commerce Building tenant rentals and Randstone Parking Garage rentals belong to CSA/RTC; therefore PAC was in no position to pledge those funds as security for the unpaid June and July 1989 utility bills. Finally, CPSB has failed to demonstrate how its alleged "equitable lien" has priority over CSA/RTC's rights to the interpleaded funds. I can locate no legal theory, nor has CPSB provided one, that entitles CPSB to the money owed it out of the funds interpleaded into the court's registry by Commerce Building tenants. Thus, in my view, CPSB has failed to prove its entitlement to the interpleaded funds. The proper remedy, if any, for an unsecured creditor such as CPSB trying to recover its unpaid utility bills would appear to be to sue PAC for breach of contract or pursuant to some other legal theory. Consequently, I will direct the clerk of court to dismiss the intervenor's action, with prejudice and with costs.

### VII. ATTORNEYS FEES [C/R–RFR # 9 and P–RFR # 17]

Both CSA/RTC and PAC request attorneys fees. Judge Prado granted summary judgment to CSA/RTC on this issue only to the extent that he concluded that CSA/RTC was entitled "to recover attorney's fees in collecting on the note." Summary Judgment Order dated October 8, 1992. However, the central dispute at trial concerned whether CSA/RTC or PAC owned the Randstone leasehold interest. PAC has prevailed on this issue and the clerk of court will be directed to enter a declaratory judgment that PAC is the owner of the Randstone leasehold interest.

██ PAC argues that it is entitled to attorneys fees pursuant to Tex.Civ.Prac. & Rem.Code Ann. § 37.009 (West 1993), which provides that "In any proceeding under this chapter, the court may award costs and rea-

sonable and necessary attorney's fees as are equitable and just." The title of the chapter is "Declaratory Judgments." Since PAC has prevailed on its declaratory judgment claim requesting that it be declared the owner of the Randstone leasehold interest—the principal issue at trial—I find that PAC's reliance on § 37.009 to be a valid basis for awarding it attorneys fees. Thus, both CSA/RTC and PAC have valid bases for recovering some of the attorneys fees generated by this lawsuit.

In my opinion, there is applicable here the legal equivalent of the law of physics: for every action, there is an equal and opposite reaction. I believe that CSA/RTC has generated roughly the same amount of attorneys fees in its winning effort to collect "on the note" as PAC has in its successful endeavor to prevail on its declaratory judgment claim regarding the ownership of the Randstone leasehold interest. Thus, I find that CSA/RTC's and PAC's respective and legitimate attorneys fee claims to be a wash. Consequently, I hold it is the better exercise of the court's discretion to require both CSA/RTC and PAC to bear their own attorneys fees in connection with this litigation.

### ORDER

Therefore, IT IS ORDERED that the clerk of court be and hereby is directed to enter a declaratory judgment that CSA/RTC is entitled either to collect the proceeds of the Rutherford and Laye judgment or, in the alternative, to collect damages from PAC in an amount equivalent to that which PAC received from Rutherford and Laye in the event the judgment has been satisfied by Rutherford and Laye.

IT IS ALSO ORDERED that, pursuant to Rule 58, Federal Rules of Civil Procedure, the clerk of court be and hereby is directed to dismiss CSA/RTC's misappropriation claims against Transland and Mr. Goldman, with prejudice and with costs.

IT IS FURTHER ORDERED that the clerk of court be and hereby is directed to enter judgment jointly and severally against PAC and Transland awarding CSA/RTC $32,416.99 plus $11,456.97 in prejudgment interest and any applicable postjudgment interest at 3.54% pursuant to 28 U.S.C. § 1961

to compensate it for tenant rentals collected by Transland on behalf of PAC for June 1989 and $10,196.35 plus $3,603.66 in prejudgment interest and any applicable postjudgment interest at 3.54% pursuant to 28 U.S.C. § 1961 to compensate it for tenant rentals collected by Transland on behalf of PAC for July 1989.

IT IS FURTHER ORDERED that the clerk of court be and hereby is directed to enter judgment awarding CSA/RTC $49,-301.02 of the remaining interpleaded funds in the court's registry account which represents the amount of June and July 1989 Commerce Building tenant rentals presently on deposit at the Frost National Bank, San Antonio, plus 91.489% of the accrued interest earned on the registry account and an applicable postjudgment interest at 3.54% pursuant to 28 U.S.C. § 1961.

IT IS FURTHER ORDERED that the clerk of court be and hereby is directed to enter judgment dismissing, with prejudice and with costs, CSA/RTC's conversion claim against Mr. Goldman.

IT IS FURTHER ORDERED that the clerk of court be and hereby is directed to enter a declaratory judgment that PAC is the owner of the Randstone leasehold interest.

IT IS FURTHER ORDERED that the clerk of court be and hereby is directed to enter a declaratory judgment that CSA/RTC is entitled to retain all Randstone Parking Garage rentals it has collected to date pursuant to its right of offset contained in its loan agreement with PAC.

IT IS FURTHER ORDERED that the clerk of court be and hereby is directed to enter judgment awarding CSA/RTC $4,586.35 of the remaining interpleaded funds in the court's registry account which represents the amount of June and July 1989 Randstone Garage Parking rentals presently on deposit at the Frost National Bank, San Antonio, plus 8.511% of the accrued interest earned on the registry account and any applicable postjudgment interest at 3.54% pursuant to 28 U.S.C. § 1961.

IT IS FURTHER ORDERED that the clerk of court be and hereby is directed to

enter judgment jointly and severally against PAC and Transland awarding CSA/RTC $2,665.28 in June and July 1989 parking rentals plus $941.48 in prejudgment interest and any applicable postjudgment interest at 3.54% pursuant to 28 U.S.C. § 1961.

IT IS FURTHER ORDERED that the clerk of court be and hereby is directed to enter judgment dismissing CPSB's action, with prejudice and with costs.

IT IS FURTHER ORDERED that CSA/RTC and PAC will bear its own attorneys fees in connection with this litigation.